# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                             )
**PETER KRANZ,**                             )
                                             )
              **Plaintiff,**              )
                                             )
              **v.**                      )   **Civil Action No. 09-2043 (ESH)**
                                             )
**VINCENT GRAY,**                     )
**Mayor of the District of Columbia**    )
                                           )
              **Defendant.**          )
_____)

## MEMORANDUM OPINION

Peter Kranz has sued District of Columbia Mayor Vincent Gray, in his official capacity, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. This action is based on allegations of discrimination and retaliation by the District of Columbia Public Schools ("DCPS"), which defendant operates.[1]  Defendant now moves for summary judgment and, for the reasons set forth below, that motion will be granted.

## BACKGROUND

Kranz was born on December 5, 1944.  He was employed by DCPS to teach science and math in District of Columbia schools on an annual contract basis from 1985–1995.  (Pl.'s Opp'n,

---

[1] Plaintiff brings his suit against the Mayor in his official capacity.  (Am. Compl. ¶ 5.)  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Accordingly, for the purposes of this Memorandum Opinion, the Court will substitute the District of Columbia as defendant.  *See Henneghan v. D.C. Pub. Schs*, 597 F. Supp. 2d 34, 37 (D.D.C. 2009) (substituting the District of Columbia for DCPS); *see also Waker v. Brown*, 754 F. Supp. 2d 62, 65 (D.D.C. 2010) (substituting the District of Columbia in place of mayor, police chief, and Department of Corrections).

Ex. 4 ("Kranz Dep."), 32:9–13, June 15, 2011.)  In 1995, he was certified as a teacher in the

District of Columbia.  (*Id*. 57:6–9).  Since that time, Kranz has submitted multiple applications

in pursuit of a permanent teaching position with DCPS, two of which form the basis of this suit.

(Am. Compl. ¶¶ 3, 11, 13–14.)[2]  While he has not been hired as a full-time teacher, he has been

working for DCPS as a substitute teacher since approximately 2005.  (Kranz Dep. 49:20–23.)

## I.      PRIOR PROTECTED ACTIVITY

On August 30, 2001, Kranz filed a complaint of discrimination with the District

of Columbia Office of Human Rights ("OHR"), alleging age discrimination because he was not

selected for a full-time teaching position after having submitted three applications to DCPS.

(Def.'s Mot., Ex. A ("OHR Order").)   On January 3, 2003, plaintiff amended his OHR

complaint to add retaliation, claiming that, after he filed the OHR complaint, DCPS failed to act

on his application to work as a substitute teacher.  (*Id.* at 4.)

On April 20, 2004, OHR found no probable cause for his age discrimination claim, but

found probable cause for his claim that DCPS retaliated against him by not processing his

application for a substitute teaching position after learning that he had filed an OHR complaint.

(*Id.* at 1.)  Plaintiff was reinstated as a substitute teacher in September 2004.  (*Id*. at 4.)  In an

OHR Order dated March 28, 2008, he was awarded backpay and costs in connection with his

---

[2] The parties appear to agree that these two applications are the only ones at issue here as they
are the only applications discussed in the briefing.  Consistent with this, plaintiff clearly states
that, at the time the amended complaint was filed, "[p]laintiff's most recent application to DCPS
was submitted on March 31, 2008, for the 2008–2009 academic year." (*Id*. ¶ 3).  The Court
notes that, in the amended complaint, plaintiff references "continu[ing] to apply for teaching
positions within the DCPS" (*id*. ¶ 34), and, in his opposition, similarly asserts ongoing
discrimination and retaliation.  (Pl.'s Opp'n at 1, 20; *see also id*. at 15 (citing to documents
created in 2008)).  However, he has not provided the Court with any applications submitted after
March 31, 2008, nor does he discussed them.

retaliation claim (OHR Order), and this award was paid in July 2008.  (Pl.'s Opp'n at 8; *see also*

*id.*, Ex. 6.)

## II.     DECEMBER 2007 AND MARCH 2008 APPLICATIONS FOR A FULL-TIME TEACHING POSITION

On December 20, 2007, plaintiff submitted an application seeking a full-time teaching

position with DCPS.  (Def.'s Mot., Ex. C ("Application 1").)   Applicants were required to

provide materials, including 1) a completed application form; 2) a resume; and 3) a written

response to the following question:[3]

> Imagine you have recently been hired in an urban school district.
> The school you will be working in is a Title 1 school with over
> 70% of its students receiving free or reduced lunch. Most students
> are 2 academic grade levels behind their peers nationally. What 3
> strategies do you plan to use in order to ensure that student [sic]
> demonstrate academic growth?

(*Id.* at 3.)

The instructions for the response read as follows:

> Please provide a response to the following questions. Please note:
> Do not provide a generic cover letter in the response fields. This
> section provides us with information not captured elsewhere in the
> application. We use your responses to evaluate your writing and
> critical thinking skills, and more importantly, to gain a sense of
> your commitment to teaching in the District of Columbia Public
> Schools and joining a highly-effective team of educators.

(*Id.*)

_____

[3] Plaintiff insists that this was not an essay question because the application form did not use the word "essay" in the instructions.  (Pl.'s Opp'n at 13.)  At other points, however, plaintiff appears to concede this by referring to the question several times as "the essay question."  (*Id.* at 14.)  Regardless, the instructions asked for a written response and explained that the response would be evaluated as an indication of applicants' commitment, their "writing and critical thinking skills," and would be treated as a means to "provide[] [DCPS] with information not captured elsewhere in the application."  (*See* Application 1.)  As such, the question clearly contemplates a thoughtful, developed response that addresses the problem posed, demonstrates a candidate's ability to write and, in any event, calls for more than the three phrases that plaintiff ultimately provided.  (*See* Def.'s Mot., Ex. F ("Application 2").)

3

For his response, plaintiff submitted a generic personal statement that did not address the question.  (*See* Def.'s Mot., Ex. D (Response to Essay Question for Application 1).)  He was not selected to move forward in the application process.  (Def.'s Mot, Ex. E (DCPS' Response to Request for Information from EEOC ("EEOC Response")) at 4.)

On March 31, 2008, plaintiff submitted another application for a teaching position to DCPS.  (Def.'s Mot., Ex. F ("Application 2").)  The application contained the same essay question as the prior year.  (*See id.* at 3.)  This time, plaintiff answered with three phrases: "hands-on activities field trips student-led projects."  (*Id.*)  Again, Kranz was not selected for an interview.  (Am. Compl. ¶ 15; EEOC Response at 5.)

Kranz describes receiving an email on June 28, 2008, from the Teach D.C. Recruitment Team stating that he was "ineligible for employment" for four reasons:

(1.) You CANNOT be a current DCPS Teacher or Related Service Provider.

(2.) You must have  Bachelor's Degree from an accredited college or university.

(3.) You must hold current certification in the area you wish to teach…

(4.) You must have current authorization to work in the United States.

(Am. Compl. ¶ 18; *see also* Kranz Dep. 84:10–25.)  Contrary to the email, it is undisputed that Kranz was not then a DCPS teacher, held a bachelor's degree from an accredited college, was certified as a teacher with DCPS, and, as a United States citizen, was eligible to work in the United States.  (*Id.*)

On July 9, 2008, he sent Jasmine Jose, Chief of Recruitment, a letter asking that she explain the email because it was "clearly false" and appeared to rely on inaccurate data about him.  (Am. Compl. ¶ 21.)  On July 11, 2008, he emailed both Jose and Michelle Rhee, the Chancellor of DCPS, to ask for an explanation.  (*Id.* ¶ 21; *see also* Pl.'s Opp'n, Ex. 17 ("Jose and Rhee Emails").)  That same day, he received email responses from Jose and Rhee, both of which

confirmed that plaintiff was correct— he did meet the minimum eligibility requirements for the

position.  (*See id*.; Am. Compl. ¶ 22.)  They went on to explain that, eligibility notwithstanding,

DCPS had received thousands of applications and Kranz had not been selected to proceed to the

next stage of the process.  (*See* Jose and Rhee Emails.)

On February 9, 2009, plaintiff filed a complaint with the EEOC, claiming age

discrimination and retaliation for prior protected activity.  (Am. Compl. ¶¶ 32–33.)

Thereafter, on October 30, 2009, plaintiff filed the instant suit, and on June 17, 2010,

filed an amended complaint.  He claims that defendant discriminated and retaliated against him

in violation of Title VII and the ADEA when it did not hire him for a full-time teaching position.

Defendant now seeks summary judgment on both claims.

## ANALYSIS

## I.       STANDARD OF REVIEW

A motion for summary judgment shall be granted "'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact, and that the moving party is entitled to judgment as a

matter of law.'"  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ.

P. 56(c)).  "An issue is 'genuine' if the 'evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)

(quoting *Anderson*, 477 U.S. at 248).  In determining whether a genuine issue of material fact

exists, a court must view the evidence in the light most favorable to the non-moving party and

draw all reasonable inferences in its favor.  *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998,

1003 (D.C. Cir. 2009) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

Plaintiff's opposition, however, must consist of more than mere unsupported allegations or

denials and must be supported by affidavits or other competent evidence setting forth "specific

facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

## II.   LEGAL FRAMEWORK

The ADEA, under which plaintiff brings this action, prohibits an employer from taking an adverse action against an employee "because of such an individual's age," 29 U.S.C. § 623(a)(1), and includes persons forty years of age or older in the protected class. *Id*. at § 631(a). To succeed on an ADEA claim, a plaintiff "must demonstrate facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856–57 (D.C. Cir. 1982) (internal quotation marks omitted).  The essential elements of a discrimination case under the ADEA are that "(i) the plaintiff [must have] suffered an adverse employment action (ii) because of the plaintiff's . . . age." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008), to ADEA claims).

Title VII contains an anti-retaliation provision that makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e–3(a).  The two essential elements of a retaliation claim under this section are that plaintiff has "suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.

In the absence of direct evidence of discrimination or retaliation, Title VII and ADEA claims are assessed under a burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792, 802–03 (1973).  Pursuant to that framework, a plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case

of discrimination or retaliation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 53 (1981).

To establish a *prima facie* case of discrimination, a plaintiff must show that (1) he is a member

of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable

action gives rise to an inference of discrimination.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C.

Cir. 2007).  The requirements to establish a *prima facie* case of retaliation differ slightly,

requiring a plaintiff to show that (1) he engaged in statutorily protected activity; (2) he suffered a

materially adverse action by his employer; and (3) a causal connection existed between the two.

*Id*.

 Once a plaintiff has made a *prima facie* case, "the burden shifts to the defendant 'to

articulate some legitimate, nondiscriminatory reason for the [challenged employment action].'"

*Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).

However, once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas*

burden-shifting framework disappears, and a court must simply determine whether the plaintiff

has put forward enough evidence to defeat the proffer and support a finding of discrimination or

retaliation.  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady*, 520 F.3d at

494 ("[W]here an employee has suffered an adverse employment action and an employer has

asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and

should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell

Douglas*.").  Instead, when deciding the employer's motion for summary judgment, the district

court "must resolve one central question: Has the employee produced sufficient evidence for a

reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual

reason and that the employer intentionally discriminated against the employee on the basis of . . .

[age]?"  *Id*.

Here, defendant concedes, for the purposes of the instant motion, that Kranz has made a *prima facie* case of age discrimination and retaliation and that he suffered an adverse employment action in that he was not hired for a permanent teaching position.  (Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 1.)  Thus, the Court will first determine whether DCPS has asserted a legitimate reason for its action, and then it will address the "central question" of whether Kranz has produced sufficient evidence to establish that DCPS' reason was pretextual.

## III.   DCPS' REASON FOR NOT HIRING KRANZ

DCPS contends that it had a legitimate, nondiscriminatory reason for not hiring Kranz: it did not select Kranz to proceed to the interview stage of the competitive selection process "because of [his] inadequate responses to the essay question in his applications for teaching positions at DCPS."  (Def.'s Mot. at 5; *see also id*. at 6–7.)[4]

The essay question was the same on the 2007 and 2008 application forms.  (*See* Application 1 at 3; Application 2 at 3; *see also* Def.'s Mot. at 6.)  The instructions direct applicants to "provide a response" to the following-- if you are hired in a low-income urban school district where students were performing below their grade-level, what three strategies would you use to ensure that the students grow academically?  (*See* Application 1 at 3; Application 2 at 3.)  The instructions explicitly advised the applicant that the response section "provides [the reviewers] with information not captured elsewhere in the application" and that the "responses [are used] to evaluate your writing and critical thinking skills, and . . . gain a sense of your commitment to teaching in the District of Columbia Public Schools."  (*Id*.)

---

[4] In its motion for summary judgment, DCPS also argues that, contrary to plaintiff's contention (*see* Am. Compl. ¶ 41; Pl.'s Opp'n at 23), the only type of damages authorized by the ADEA is backpay.  (Def.'s Mot. at 8–9.)  Because this Court grants summary judgment, it need not address this argument.

Defendant has explained the selection processes it used in 2007 and 2008-- the years in which plaintiff submitted the applications at issue in this suit.  (*See* EEOC Response at 1–4.) In both years, applications were submitted online and screened to ensure that candidates possessed the requisite educational credentials, had passed the Praxis exam, and were certifiable as teachers.  (EEOC Response at 1.)[5]

In 2007, the group of eligible applicants was then screened based on their responses to the essay question.  Specifically, responses were evaluated based on candidates' demonstration of six "key skills: achievement, critical thinking, professional interaction, personal responsibility, commitment to urban schools, and communication."  (*Id*. at 2.)  Reviewers evaluated each applicant's performance within each skill area and assigned a rating of either "Fully Acceptable" or "Not Fully Acceptable."  (*Id*.)  The applicants who received a "Fully Acceptable" rating for all six skill areas were placed in the pool of candidates to be considered by the principals.  (*Id*.)  Those who received at least one "Not Fully Acceptable" were not placed in that pool.  (*Id*.)

In 2008, this selection process was modified slightly.  (*Id*.)  Applicants were assigned points based on (1) their basic qualifications and (2) their responses to the essay question.  (*Id*.)  If the applicant received at least 50%[6] of the total available points, he or she was placed in the pool of candidates who could be hired by school principals.  (*Id*.)[7]

---

[5] Applications were accepted on a rolling basis, regardless of the number of vacant positions. (EEOC Response at 3.)

[6] Based on different numbers of eligible teachers in different subject matter areas, this percentage varied slightly: those applying to teach social studies were required to earn at least 70% of the total points and those applying to be a math or special education teacher were only required to earn 30% of the total points.  (*Id*.)

[7] The record shows that, in 2007, DCPS received 1,789 applications for the 2007–2008 school year and in 2008, received 2,415 for the 2008–2009 school year.  (EEOC Response at 4.) Neither party has provided information about the number of applicants selected to proceed to the interview stage or the number eventually hired.

When reviewing applications, DCPS placed significant emphasis on the essay response and on an applicant's commitment to teaching in DCPS.  (*See* EEOC Resp. at 2–3 (describing review processes in 2007, 2008, and subsequently); *see also* Def.'s Reply at 4 (explaining that "the failure to exhibit a desire to work with the type of underprivileged students DCPS serves was a compelling indication that [plaintiff] was not a good fit for the position").)

When Kranz submitted Application 1, he answered this question by providing a personal statement, which both conflicted with the application form's clear instruction *not* to submit a generic cover letter and ignored the question that he was asked to answer.  (*See* Def.'s Mot., Ex. D (Kranz' Essay Response in Application 1).)  When he submitted Application 2, Kranz answered this same essay question by submitting three phrases: "hands-on activities field trips student-led projects."  (EEOC Resp. at 5; Application 2 at 3).  As explained by DCPS, this answer "lacked proper grammar, depth, and analysis" (Def.'s Mot. at 7), "lack[ed] simple punctuation and capitalization," and did not demonstrate the "thoughtfulness, detail, and commitment that DCPS seeks in the essay responses."  (EEOC Resp. at 5.)  Because Kranz' responses on both the 2007 and 2008 applications were inadequate, he was not selected from the thousands of online applications to proceed to the interview stage of the hiring process.  (*Id.*; Def.'s Reply at 4.)

Thus, DCPS has provided a legitimate, nondiscriminatory and nonretaliatory reason for not hiring Kranz.  Therefore "[w]here, as here, the employer has proffered a [non-discriminatory,] non-retaliatory explanation for a materially adverse employment action, the sufficiency of the plaintiff's prima facie case is no longer in issue, and 'the only question is whether the employee's evidence creates a material dispute on the ultimate issue of [discrimination or] retaliation.'"  *McGrath v. Clinton*, No. 10-5043, 2012 U.S. App. LEXIS

1440, at *5 n.3 (D.C. Cir. Jan. 27, 2012) (citing *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir.

2009)); *see also Hamilton v. Geithner*, No. 10-5419, 2012 U.S. App. LEXIS 911, at *14 (D.C.

Cir. Jan. 17, 2012).

## IV.    EVIDENCE OF PRETEXT

To rebut defendant's proffered reason for the challenged action, Kranz must "show that a

reasonable jury could conclude from all of the evidence that the adverse employment decision

was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

He may show that this reason is mere pretext "directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs*, 450

U.S. at 256. However, "[i]t is not enough for the plaintiff to show that a reason given for a job

action is not just, or fair, or sensible. He must show that the explanation given is a phony

reason." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting

*Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)); *see also Madan v. Chao*, No.

05-5146, 2005 U.S. App. LEXIS 21741, at *2 (D.C. Cir. Oct. 5, 2005) (same). That has not been

done here.

In an attempt to show pretext, Kranz argues that his academic and professional

credentials should have earned him an interview even if his response to the essay question was

inadequate. (Pl.'s Opp'n at 18–19.) To do this, he tries to downplay the importance of the essay

question by pointing out that there was no word minimum and that he in fact "responded to the

essay question" by submitting (1) the personal statement in 2007 and (2) a three-phrase response

in 2008. (Pl.'s Opp'n at 14 (Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute);

*see also* Pl.'s Opp'n at 7, 20–21.)

However, while plaintiff insists that his response was adequate, he does not argue that his answer in fact evinced "proper grammar, depth, [or] analysis" or that it demonstrated the insight that DCPS considered to be important.  Rather, he urges, the Court to question whether defendant placed so much emphasis on the essay question.  (Pl.'s Opp'n at 18.)[8]  However, plaintiff has failed to produce any evidence to undercut defendant's position regarding the importance of the qualities and aptitudes captured in the essay portion of the application.[9] Indeed, the Court of Appeals has upheld analogous processes that give more emphasis to applicant responses to "questions concerning the way in which [they] would approach the job" and less emphasis to credentials among basically qualified candidates.  *Fischbach*, 86 F. 3d at 1183–84 (finding it to be an "obviously reasonable method of hiring a professional employee");

---

[8] It is unknown what Kranz' ratings were under the 2007 review process or his total score under the 2008 review process.  Although plaintiff has provided what appears to be a generic application scoring sheet in which DCPS reviewers "assign quality points" to the application (Pl.'s Opp'n, Ex. 2), he does not provide an assessment sheet for Kranz' application nor does he argue that his application was incorrectly scored such that he should have moved on to the next stage of the selection process.  (As best the Court can tell, the application scoring sheet (*see id.*) appears to be Exhibit B2, which accompanied the EEOC Response that DCPS submitted to show its general selection process in 2008.  (*See* EEOC Response at 3.))  In any case, neither plaintiff nor the application scoring sheet provides information about the number of points available on the application overall or the maximum points that candidates could earn even if they received zero points for their essay responses.

[9] Although the exact weighting process used to review Applications 1 and 2 is unknown, it is known that the answer to the essay question was heavily weighted in the 2009 version of the selection process.  In 2009, essay responses were rated (1) based on four different writing standards, for which applicants could earn a total of twelve points and (2) based on content knowledge, for which applicants could earn a total of nine points.  (EEOC Response at 2–3.) Acceptable essay responses included those in which applicants provided "examples of: building assessments to measure student progress toward mastery, creating objective–driven lesson plans, selection instructional strategies and resources, evaluating the effectiveness of their instruction, analyzing learning standards, creating long–term unit plans, building student investments, communicating with families, and collaborating with colleagues."  (*Id.*)  To proceed to the next stage of the 2009 selection process (the telephone interview), an applicant had to earn at least nine of the twelve points available on the writing standards and three of the nine points available on the content-knowledge portion.  (*Id.* at 3.)

*see also Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 508 (D.C. Cir. 2005).  In

addition, "courts must not second-guess an employer's initial choice of appropriate

qualifications; rather the courts 'defer to the [employer's] decision of what nondiscriminatory

qualities it will seek' in filling a position." *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir.

2007) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003).  Moreover, this Court

should "not second–guess how an employer weighs particular factors in the hiring decision."

*Jackson*, 496 F.3d at 705; *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) ("[C]ourts

must defer to the employer's decision as to which qualities required by the job . . . it weighs

more heavily.").

      Ultimately, plaintiff's focus on his "outstanding" qualifications misses the mark because

defendant's reason is not that Kranz lacked credentials, but rather, he provided inadequate essay

responses.   (Def.'s Mot. at 1, 3, 5–7.)  Kranz has not offered any evidence to undermine the

legitimacy of DCPS's selection process as applied to him or that the selection process in his case

deviated from the norm.  *See, e.g., Salazar*, 401 F.3d at 508–09.  And, significantly, although

Kranz points out that DCPS hired teachers with less impressive credentials (Pl.'s Opp'n at 2–3,

19), he has not offered any evidence that an applicant who submitted a similarly deficient

response to the essay question was hired nonetheless.   *Cf. Brady*, 520 F.3d at 495 ("Often, the

employee attempts to produce evidence suggesting that the employer treated other employees of

a different [age] more favorably in the same factual circumstances.").

      Plaintiff also argues that DCPS' reason is not credible because DCPS has violated

municipal regulations in declining to hire Kranz.  (Pl.'s Opp'n. at 20 (referencing the entirety of

Chapter 5 of the District of Columbia Municipal Regulations ("DCMR")); *see also* Am. Compl.

¶ 29 (citing to the DCMR, ch. 5, §§ 1005.1–1005.3, 1110.1).)  These regulations, however,

simply mandate that DCPS "operate a continuing recruitment program designed to meet current and projected personnel needs of the school system" that is compliant with, *inter alia*, a merit plan and provide that applicants may be required to submit supporting documents including records of prior professional and academic experience. DCMR, ch. 5, §§ 1005.1–1005.3; *see also id*. § 1110.1 (explaining that, with regard to promotions, the Board of Education shall choose the "best qualified candidates available"). Thus, they do not preclude or conflict with the selection process here. Along the same lines, plaintiff contends that DCPS has violated its own policy requiring "that the application is to be rated, scored and analyzed in its entirety." (Pl.'s Opp'n at 20.) In support of this contention, he cites only to an "Application Rating Sheet" that offers no support for his claim, for it neither conflicts with DCPS' emphasis on candidates' responses to the essay question, nor indicates that any specific point value must be ascribed to the essay question. (*Id*. (citing to Exhibit 2).) Therefore, there is no evidence that the selection process was "'irregular or inconsistent with [DCPS'] established policies." *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (citing *Simms v. Okla.* ex rel *Dep't of Mental Health & Substance Abuse Servs*., 165 F.3d 1321, 1330 (10th Cir. 1999)).[10]

Kranz also makes much of the seemingly inconsistent explanations that were provided for why he was not hired. (*See* Pl.'s Opp'n at 5–8, 21.)[11] In support of this, he describes receiving

---

[10] Plaintiff also suggests in passing that "[d]efendant's statistics on hiring indicate that [it] hires very few if any teachers that are [Kranz'] age." (Pl's Opp'n at 10.) Again, he does not provide any evidence to support this assertion. (*See id.* (citing to the OHR order, which offers no support for this proposition.) In fact, the OHR order to which Kranz cites lends more support to defendant, since it found no probable cause for Kranz' previous complaint of age discrimination on the part of DCPS. (OHR Order at 1.) Similarly, plaintiff's repeated references to vacant teaching positions (*see, e.g*., Pl.'s Opp'n at 5, 7, 10) does not undermine defendant's reason for declining to hire him, for defendant has explained that it chose not to hire plaintiff because of his inadequate response to the essay question and not for lack of vacant positions.

[11] Attempting to portray defendant's explanation as inconsistent, plaintiff cites to a letter discussing complaints about his performance as a substitute teacher in 2011 (*see* Pl.'s Opp'n at

an email from D.C. Teacher Recruitment in June of 2008, indicating that he was ineligible to apply for a DCPS teaching position because he lacked citizenship, the requisite academic credentials, District of Columbia residency, and since he was already employed as a teacher. (Kranz Dep. 84:10–25.)[12]

    If it were the case here (which it is not), "'[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext,'" *Geleta v. Gray*, 645 F.3d 408, 414 (D.C. Cir. 2011) (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) and citing *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001), and *Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)).  This logic applies when an employer's reason for allegedly discriminatory actions changes in a material way throughout the stages of litigation.  *See, e.g.*, *Domínguez-Cruz*, 202 F.3d at 432 ("*Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.*") (quoting *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994)) (emphasis added).  In *Geleta*, for example, at the time of the discriminatory job transfer, one of Geleta's supervisors told him to "make up a reason" to explain why he was transferred, subsequently the defendant claimed that the transfer was due to Geleta's program being dismantled, and even later the defendant explained the transfer was a departmental realignment to "implement a 'new vision' for the program." *Geleta*, 645 F.3d at 413.  Similarly in *Thurman*, the defendant's rationale for the discriminatory failure-to-hire changed markedly through the course of litigation: the employer never mentioned Thurman's poor performance when initially

---

21 (citing to Ex. 11)), but that letter is not relevant to the actions at issue here because it concerns a different DCPS decision relating to his employment as a substitute teacher.

[12] Neither party has provided this email and the Court's only evidence relating to the email is Kranz' deposition testimony.  (*See* Kranz Dep. 84:3–25.)  Importantly, the author of the email is not even identified.

questioned, indicated in the course of discovery that Thurman's performance and attitude had "waned somewhat," and later still, in the pretrial order, claimed that it chose not to hire Thurman because of his poor performance. *Thurman*, 90 F.3d at 1167 (finding it additionally relevant that the record belied the substandard performance claim). Likewise, in *Domínguez-Cruz*, the First Circuit found that an employer's "inability to settle on an explanation" may allow a jury to infer pretext. 202 F.3d at 432. There, the plaintiff was first told by his supervisor and the personnel manager that he was being fired because his position was being eliminated due to restructuring. *Id*. Subsequently, in its answer to the complaint, the employer denied that the termination was due to restructuring and said that it was because the plaintiff had repeatedly violated company policies. *Id*. at 431-32. Still later, during discovery, the employer's high-level officers continued to offer different and conflicting reasons for firing the plaintiff. *Id*. at 432.

The alleged inconsistency here is quite different. Plaintiff's argument rests on his claim that he received an email from the Teach D.C. Recruitment Office which indicated that he was ineligible for a teaching position for four different reasons, not one of which applied to him.[13] At the time, Kranz recognized that this letter was simply incorrect. In response to his inquiries to Rhee and Jose, both responded that same day, confirming that Kranz was correct, affirming that he was in fact eligible for a teaching position with DCPS, and stating that he simply had not been selected to proceed to the next stage of the competitive selection process. (Pl.'s Opp'n, Ex. 17 at 2 ("You were not selected to continue with the process. Though you meet the minimum eligibility requirements, that does not guarantee a job as a teacher with [DCPS].").)

---

[13] This email would also be internally incoherent because it described a candidate who was ineligible to teach for DCPS for lack of residency, citizenship, and proper academic credentials and yet he or she was, at the same time, already employed in a DCPS teaching (or similar) position.

Unlike *Geleta*, *Thurman*, or *Domínguez-Cruz*, this is not a case where Rhee and Jose initially gave Kranz one explanation for not hiring him and then changed the story over the course of time.  *See, e.g.*, *Thurman*, 90 F.3d at 1167 (finding it relevant that "[the employer] changed its factual position as the litigation continued); *see also Geleta*, 645 F.3d at 413 (same)). Nor is this a case in which one "higher-up" proffers one reason for the employer's action while another puts forward a different explanation.  *See, e.g, Caudle v. Dist. of Columbia*, No. 08-00205, 2011 U.S. Dist. LEXIS 92590, at **30–35 (D.D.C. Aug. 19, 2011);  *Domínguez-Cruz*, 202 F.3d at 432.  Unlike those cases, where the more recent rationale was difficult to credit in light of the previously-proffered explanation, the initial email from some unidentified person (*see supra* note 12), provides no basis upon which to infer that the current reason is fabricated. As everyone recognized, the email made no sense, the error was immediately corrected by Jose and Rhee,[14] and their statements in July 2008 were, although not detailed, consistent with DCPS' explanation.

Finally, plaintiff contends that this Court should find DCPS' nonselection of Kranz retaliatory based on its "pattern of discrimination against him."  (Pl.'s Opp'n at 21.)  This claim is based on the OHR finding that Kranz was retaliated against in 2004 for his 2001 complaint of age discrimination.  (Pl.'s Opp'n at 21.)  While pursuit of the OHR judgment may well be protected activity, *see Singletary v. Dist.of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (considering ongoing pursuit of discrimination claims to be protected activity); *see also Hamilton*, No. 10-5419, 2012 U.S. App. LEXIS 911, at *36 (reaffirming that protected activity

---

[14] *See Zelaya v. UNICCO Serv. Co.*, 733 F. Supp. 2d 121, 128 (D.D.C. 2010) (clerical error fails to establish discriminatory animus).

may occur years after the original protected activity),[15]   temporal proximity alone is simply insufficient to discredit defendant's proffered explanation.   *Sewell v. Chao*, 532 F. Supp. 2d 126, 139  (D.D.C. 2008) ("[T]emporal proximity . . . standing alone . . . is insufficient to discredit defendant's proffered explanation"), *aff'd sub nom*, *Sewell v. Hugler*, No. 08-5079, 2009 U.S. App. LEXIS 4136 (D.C. Cir. Feb. 25, 2009); *see also Morgenstein v. Morgan Stanley DW Inc.*, No.  05-2123, 2007 U.S. Dist. LEXIS 678, at *17 (D.D.C. Jan. 31, 2007) ("[P]roximity alone does not defeat a motion for summary judgment.").

## CONCLUSION

Ultimately, plaintiff has not carried his burden of establishing pretext.  He has not provided evidence that defendant's decision not to give him an interview was motivated by anything other than his patently inadequate responses to an important part of the selection process.  Defendant's motion will therefore be granted.  A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 31, 2012

---

[15] Therefore, the Court will assume that the protected activity included plaintiff's pursuit of the OHR judgment which was realized in July 2008.  (*See* Pl.'s Opp'n at 8.)